John P. COYNE, Administrator of the Estate of James J. Barber, Deceased, Plaintiff,

v.

MARQUETTE CEMENT MANUFACTURING COMPANY, Inc., an Illinois corporation, and Dravo Corporation, a Pennsylvania corporation, Defendants.

Civ. A. No. 63–376.

United States District Court
W. D. Pennsylvania.

May 13, 1966.

**382**

Edward J. Balzarini, of Suto, Power, Balzarini & Walsh, Pittsburgh, Pa., for plaintiff.

William C. Walker, of Dickie, McCamey, Chilcote & Robinson, Pittsburgh, Pa., for defendant, Marquette Cement Manufacturing Co. Inc.

James F. Manley, of Burns & Manley, Pittsburgh, Pa., for defendant, Dravo Corp.

MARSH, District Judge.

In this diversity action the administrator of the estate of James J. Barber, deceased, sued Marquette Cement Manufacturing Company, Inc. (Marquette) and Dravo Corporation (Dravo) under the Pennsylvania Wrongful Death and Survival Acts, alleging that the decedent's death was caused by the joint and several negligence of the defendants, Marquette and Dravo. Each defendant denied liability, and each affirmatively pleaded contributory negligence on the part of decedent. In addition, Dravo alleged that it was a statutory employer of the decedent under the Pennsylvania Workmen's Compensation Act and exempt from common law liability.[1]

The fatal accident occurred on May 16, 1962, on premises owned by Marquette. Marquette had entered into a contract (Ex. 1) with Dravo to engineer and construct, inter alia, one crane runway and supports at Marquette's Neville Island plant in Allegheny County, Pennsylvania. The contract provided that the owner Marquette would have full control of the work in all of its phases, including the subletting of such parts of the work as may be desirable, the progress and sequence of the work, and all other questions. The retention of complete control by Marquette is emphasized and amplified in several portions of the contract.

The contract designated Dravo as an independent contractor. It further provided:

"The Contractor [Dravo] shall take all necessary precautions for the safety of employees on the work * * *. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protec-

---

1. 77 Purdon's Pa.Stat.Ann. § 52.

tion of workmen and the public * *; and he shall designate a responsible member of his organization on the work, whose duty shall be the prevention of accidents."

After the execution of this contract, Dravo issued a purchase order to Ingalls Steel Construction Company, Inc. (Ingalls) which authorized it to furnish and erect the fabricated structural steel required for the crane runway. Subsequently, Ingalls entered into a written contract whereby Penn Erection and Rigging Company (Penn) agreed to erect the fabricated steel ordered by Dravo from Ingalls.

The decedent, James J. Barber, was an employee of Penn. He was killed as a result of a 43-foot fall from a concrete pier while engaged in the course of his employment.

Marquette filed a cross-claim against Dravo pursuant to an indemnity clause in the contract between them which provided:

"IV. HOLD HARMLESS: The successful Bidder agrees to protect, defend, indemnify and save harmless Marquette, its officers and employees, from and against all loss, claims and expense for loss of or damage to property (including Marquette property) and loss of use and injuries to or death of persons (including by [sic] not limited to Marquette employees or of the successful Bidder) arising from performance under Proposal and Contract unless due to the sole negligence of Marquette." (Ex. 1)

The jury returned general verdicts[2] in favor of the plaintiff and against Marquette and Dravo, finding pursuant to instructions that the former was liable under the doctrine of respondeat superior, Restatement Torts 2d, § 414.

At trial the court thought special interrogatories were advisable in order to help resolve Dravo's liability under the indemnity clause and to determine affirmatively whether Marquette, through its own employees as distinguished from Dravo's employees, was guilty of primary acts of negligence which caused decedent's death.

Responding to the special interrogatories the jury found that Marquette was not the negligent cause of decedent's death but that Dravo was the negligent cause thereof. These special findings were fully supported by the evidence. The jury also found specially that the decedent was not guilty of contributory negligence.

Pursuant to Dravo's motion for a directed verdict (T., p. 464), denied at trial (T., pp. 482–484, 490), the general verdicts and the judgments entered thereon in favor of the plaintiff and against Dravo were set aside because it appeared to the court from the undisputed evidence that Dravo was the decedent's statutory employer under the Pennsylvania Workmen's Compensation Act. Shaw v. Edward Hines Lumber Co., 249 F.2d 434 (7th Cir. 1957).

On the cross-claim, judgment was entered against Dravo as indemnitor in favor of Marquette because it appeared not only that the harm was not caused by the sole negligence of Marquette, but that its liability was only secondary under the doctrine of respondeat superior, and that Dravo was guilty of active negligence and its liability was primary.[3]

Thereafter, Dravo and Marquette filed timely motions for judgment n.o.v., which, in our opinion, should be denied.

Viewing the evidence in the light most favorable to the plaintiff and giving him the benefit of all inferences which might reasonably be drawn therefrom, the facts may be summarized as follows:

On May 16, 1962, the date of the accident, a substantial portion of the Marquette-Dravo contract had been completed. The elevated crane runway had been fabricated by subcontractor Ingalls and erected by sub-subcontractor Penn.

2. In the Wrongful Death Action, the verdict was $87,000, and in the Survival Action it was $30,000.

3. See Order of December 7, 1965, approved as to form by all parties.

However, Dravo's engineers had determined that the steel crane runway was not properly aligned and that a steel girder would have to be repositioned. Penn employees had repositioned the girder, and it remained for them to reweld certain joints. The rewelding was to be performed from a float-type scaffold suspended by manilla ropes from the crane runway down the side of a concrete pillar which supported the crane runway. There was evidence that Penn's employees were being hurried (T., pp. 29, 150, 253).

Mr. McLean, Dravo's principal structural engineer, had issued a written order covering the rewelding phase of the work. He directed that no welding was to be performed unless and until Dravo's welding supervisor was present. Dravo specified that only a certified welder would be permitted to do the rewelding and specified the type of weld electrodes to be used.

David P. Childress, Dravo's field superintendent on the job, ordered Clayton M. Woodson, Penn's foreman, "to do as he [Dravo's welding supervisor] instructed me to do." On the day of the accident, Woodson selected decedent to perform this important rewelding work. Decedent was a structural iron worker of many years' experience and was a qualified welder. He was told that Dravo's welding supervisor would be in charge. William Drigallo, one of Dravo's welding engineers, was the supervisor assigned to supervise and witness the rewelding.

Within two feet of one of the places where decedent was to reweld were lubrite bronze plates. Dravo's supervisors had knowledge of the existence and location of these plates by reason of plans and drawings in their possession. The presence and location of these bronze plates were not communicated to the decedent or to Woodson, Penn's foreman in the field; the revision drawing given to the latter did not reveal their presence. Woodson testified that if he had known of the presence of the bronze plates, he would have called this to the attention of the decedent and to all other men working there. Because of the smoke and dirt, it was difficult to detect the bronze plates visually. Woodson testified: " * * * [Y]ou can weld mild steel to bronze and it will look just like it is welded, but you can take your hand or foot and kick it loose. It will not hold. All the weld will stay on the mild steel, and the bronze, it will tear it loose." [4]

The duties of Childress required him to supervise the activities of the subcontractors, the safety of the workmen, and immediately call any unsafe conditions to the attention of their foremen. Childress seemed to act as Dravo's safety supervisor, had daily safety discussions with Woodson, and told him that Dravo had in its trailer two safety belts with lines which Penn was welcome to use. Dravo's safety regulations for its own employees and subcontractors' employees required that safety belts be furnished and worn where falls from heights are possible. The regulations provided that "any deviation from this course of action will be called to the attention of your supervision for immediate correction." Childress observed Penn's employees working in hazardous places without safety belts during the six-week period prior to the accident and knew that Penn did not enforce the safety regulations in this respect.

Childress was present at the job site on the day of the accident. Dravo's trailer was located approximately 250 feet from the point where the work was being performed and Childress had an unobstructed view of that area from his trailer. After the accident, Dravo's safety booklets and safety belts were

4. Woodson had previously testified that any qualified welder would know that he was welding mild steel to bronze because "it would be just like frying an egg * * *. It would be a sizzling sound and sparks would fly all over."

distributed by Dravo to Penn's field personnel.[5]

Just prior to the accident, Drigallo was met at the immediate work area by Woodson and the decedent. Drigallo inspected and approved decedent's certification papers and the type of electrodes to be used. The type of electrodes specified and approved were not the type which could be used to weld mild steel to bronze. When the three men arrived on the float, Drigallo inspected the places to be rewelded and issued certain orders to other Penn workmen on the float. Drigallo then directed the decedent to weld the side of the "shoe" to the bottom of the box girder. He stood behind the decedent while a weld of about 30 inches was being made and inspected the seam as it was obtained.

Next, Drigallo said to the decedent, "get that other side." The decedent, after looking to see if he could, stated: "I can't reach it. We'll probably have to move the float." Drigallo then said: "Well, you have only got about five inches to weld. Can't you build yourself some sort of a hand hold to get it? See, you only have about five inches to weld. See if you can't weld yourself a hand hold to get it." Thereupon the decedent requested an angle iron and after receiving one, he left the float and stood on an electrical conduit affixed to the side of the concrete pillar, with the angle iron between his knees. The angle iron was 3 inches by 3 inches and was approximately 30 inches long. He then proceeded to prepare his welder, placed the angle iron in position, pulled down his hood, and started to weld. The decedent welded the angle iron to about 2½ inches of the lubrite bronze plate along the base of the elevated crane runway. Within a minute Drigallo heard a metallic noise and when he looked (he had turned his head to avoid the light of the welding arc) decedent had fallen to the ground and sustained the injuries from which he died.

It was not unusual for iron workers to weld themselves a lug or handhold to sit on (T., p. 141) or lean on while doing their work (T., pp. 115, 127–128, 392). Penn did not furnish its employees safety belts and nylon lines, nor did they use ropes for safety purposes (T., pp. 107, 237, 251).

Presumably the jury inferred from all the circumstances, including the instinct of self-preservation, that the decedent was not aware that he was welding mild steel to bronze.

Dravo assigned five reasons in support of its motion for directed verdict. No additional reasons were set forth in its motions for judgment n.o.v. The assigned reasons are:[6]

"1. The Plaintiff has failed to prove a cause of action upon which relief can be granted.

"2. The Plaintiff's own evidence establishes that the Plaintiff's decedent was guilty of contributory negligence in that Plaintiff's decedent left a place of safety and proceeded to work hanging in a precarious position forty-three feet above the surface of the ground without any safety lines or without having anything between him and the ground to catch him in the event that he would slip or fall.

"3. The Plaintiff's proof establishes that the Plaintiff [sic] was a competent welder and that any competent welder knew or should have known that he was encountering metal other than mild steel at the time he made the weld and, therefore, should have been apprised of the situation.

---

5. Testimony as to the post-accident distribution of the safety belts and Dravo's safety booklets was admitted in evidence "for the purpose of showing control" by Dravo (T., pp. 79, 221–222; transcript of instructions to jury, p. 18.)

6. Dravo is restricted to the grounds specifically asserted and cannot question the plaintiff's verdict against Marquette on other grounds. Rule 50(a), Fed.R.Civ.P. Lewis v. Mears, 189 F.Supp. 503, 510 (W.D.Pa.1960), aff'd 297 F.2d 101 (3d Cir. 1961).

"4. Plaintiff has failed to establish that Defendant knew or should have known that the Plaintiff [sic] was going to weld at the place where he allegedly welded because the place was not a place where any welds were required or anticipated by the plans, specifications or any of the job requirements.

"5. The within court lacks jurisdiction of Dravo because Dravo is a Statutory Employer in the within action under the evidence."

■ Dravo's first reason has been sustained and, as heretofore stated, the verdicts and judgments in favor of plaintiff and against Dravo were set aside because the court concluded that it was a statutory employer. In our opinion, it was disclosed by undisputed evidence, and conceded by the plaintiff (T., pp. 468, 484), that the premises on which the accident occurred were "occupied" by Dravo, or "under his [its] control　＊　＊, for the performance upon such premises of a part of the employer's [Dravo's] regular business entrusted to" its subcontractor Ingalls and sub-subcontractor Penn. 77 Purdon's Pa.Stat.Ann. § 52. Qualp v. James Stewart Co., 266 Pa. 502, 109 A. 780 (1920). It was the plaintiff who proved that on the date of the accident Dravo was in actual control of the premises and the safety of the workmen (see f.n. 5, supra), and that Dravo's welding supervisor, Drigallo, was in actual charge of Penn's employees, including decedent, and issued directions and orders to them.

■ Marquette's motion for judgment n.o.v. is based upon the proposition that the jury having found specially that it was not the negligent cause of the harm, the judgments entered in favor of the plaintiff and against it on the general verdict were in error. According to the Marquette-Dravo contract, Marquette retained full control over all phases of the work in the partial performance of which

the decedent was killed by the active negligence of Dravo, Marquette's contractor. Therefore, in our opinion, Marquette is liable to the plaintiff as a matter of law pursuant to the doctrine of respondeat superior. Restatement of Torts 2d, § 414; Jamison v. A. M. Byers Company, 330 F.2d 657 (3d Cir. 1964); cf. Trent v. Atlantic City Electric Co., 334 F.2d 847 (3d Cir. 1964) wherein the Court, at p. 864, construes a contract remarkably similar to that in the case at bar.

■ Thus we hold that the general verdict in favor of plaintiff and against Marquette alone should stand. And, since the jury found specially that Dravo was the negligent cause of decedent's death, we hold that the judgment entered in favor of Marquette and against Dravo for indemnity on the cross-claim should stand.[7]

■■ Dravo's fourth reason attacks the sufficiency of plaintiff's proof of negligence with respect to one of his theories of negligence, in that there was no proof that Dravo knew or should have known that the decedent was going to weld the angle iron to lubrite bronze. From the evidence, the jury could have found that Dravo, through Childress and Drigallo, its supervisors on the job, knew or should have known of the presence of lubrite bronze plates within two feet of the place where the rewelding was to be performed by decedent. The drawing disclosing the location of lubrite bronze was in Dravo's trailer. Drigallo had examined this drawing in Mr. McLean's office when he was assigned to supervise the rewelding. It was Drigallo who ordered decedent to make this reweld, knowing that it could not be reached from the float. Drigallo knew that the float should be moved (T., pp. 376–378). The decedent suggested that the float be moved so that the five-inch overhead reweld could be executed from the float (T., pp. 74–75, 90, 115–116). Notwithstanding, Drigallo suggested to

7. Dravo in its reasons for judgment n. o. v. does not attack the validity of the indemnity provision in the contract (Ex.

1) which is the basis of Marquette's cross-claim; it does attack the interpretation thereof.

decedent that he leave the safety of the float and rig a handhold so that he could do this work (T., pp. 74–75, 94–95, 115). Drigallo knew or should have known that decedent had to weld the handhold in the vicinity of lubrite bronze plates and should have warned him of the danger. The demonstrative evidence indicated that one of the bronze plates was a likely place to be utilized for welding the handhold as a support for decedent to enable him to proceed with the five-inch overhead reweld.

The decedent, a "business visitor", was entitled to expect that Dravo, in possession and control of the premises, through Childress, its field superintendent, and Drigallo, its welding supervisor in actual charge of the welding work that day, would take reasonable care to ascertain the actual conditions and give warning to Penn's foreman and to decedent of the presence of bronze plates in the vicinity of the rewelding and the risk involved if a handhold was to be rigged. Cf. Restatement, Torts 2d, § 343; Stringert v. Lastik Products Co., 397 Pa. 503, 155 A.2d 625 (1959). The evidence established that Dravo gave no warning of the danger. Dravo's fourth reason for judgment n.o.v. is without merit.

Moreover, the plaintiff produced evidence of other facts from which negligence on the part of Dravo could have been inferred involving the violation of its obligation under the contract (Ex. 1) to look out for the safety of the workmen. Drigallo not only neglected to order the float repositioned so that decedent could perform the overhead reweld while standing on the float but instead prompted the decedent to leave the safety of the float to perform the work. Also, Dravo's supervisors in charge not only failed to provide decedent with one of the available safety belts and lines in violation of its own safety regulations requiring that safety belts should be worn in high places where there was a possibility of falling, but failed to restrain the dece-

dent from going beyond the safety of the float where there was a possibility of falling.

In view of the risks involved, the jury could have found from the evidence, particularly with respect to Drigallo, that in the circumstances preventative precautions were practicable and should have been taken for decedent's protection.

Although Dravo argues issues of causation, such were not specifically assigned as reasons in its motions for a directed verdict and judgment n.o.v.[8] Despite this omission, we think the jury was fully warranted in finding that any one of the several negligences proved, i.e., failure to warn decedent of the presence of lubrite bronze, failure to move the float so that decedent could weld from the float, failure to furnish decedent with a safety belt and safety line, failure to insist that he use a safety line when he left the safety of the float, and permitting, if not directing, decedent to rig a handhold beyond the safety of the float, was a substantial factor in causing the decedent to fall. From all the circumstances, it was a matter of reasonable inference for the jury to find that the decedent did sit or lean on the welded handhold and that the weak weld tore apart causing him to fall.

Dravo's second and third reasons for judgment n.o.v. contend that the decedent was guilty of contributory negligence as a matter of law. We think this issue was for the jury. As stated in Thorton v. Arnoff, 279 F.2d 39, 40 (3d Cir. 1960):

"The Pennsylvania rule relating to declaring contributory negligence as a conclusion of law is firmly established by a wealth of decisions. 'It is only in those cases where contributory negligence is so clearly revealed that fair and reasonable individuals would not disagree as to its existence that it may be declared judicially.' [Citations omitted.] 'Contributory negligence

8. See f. n. 6, supra. Marquette does not assign any issue of causation as grounds for judgment n. o. v. in its motion.

may be declared a conclusion of law only in the most unequivocal cases.' [Citation omitted.] 'It is only in clear cases where the facts are undisputed and but one inference can be drawn from them that courts can declare as a matter of law a party guilty of contributory negligence * * *.' "

In cases involving a workman, who is experienced in working on elevated structures where there is danger of falling, the Pennsylvania Supreme Court has held that considerations of performance of his job in a customary and usual manner make the issue of contributory negligence one for the jury. Powell v. T. Bruce Campbell Construction Company, 412 Pa. 456, 194 A.2d 883 (1963); Gregorius v. Safeway Steel Scaffolds Company, 409 Pa. 578, 187 A.2d 646 (1963).

From the evidence the jury could have found that it was not an unusual practice, and perhaps a common one, for experienced structural steel workers to weld handholds for support in the efficient prosecution of their work. Dravo was in a hurry to rectify the alignment error in the runway and it would have taken considerable time to reposition the float. In resolving the issue of contributory negligence, it was for the jury to take into consideration all the circumstances including decedent's obligation to faithfully do his job and his obligation to exercise care for his safety in a place of great danger.

In its fifth reason for judgment n. o. v., Dravo attacks the jurisdiction of the court because Dravo is a statutory employer. Jurisdiction is grounded upon diversity of citizenship between the plaintiff, a citizen of Virginia, and the defendants, Dravo, a Pennsylvania corporation, and Marquette, an Illinois corporation with its principal place of business in a state other than Pennsylvania. 28 U.S.C. § 1332.

In his complaint the plaintiff alleged that Dravo and Marquette were jointly and severally liable on grounds of common law negligence. Throughout the trial, the plaintiff strenuously opposed Dravo's contention that it was a statutory employer.

■ It is not uncommon in Pennsylvania for an employer, statutory or general, to be sued or joined as a defendant in a common law action of trespass brought by an injured employee against a third-party tortfeasor.[9] In such cases, if the relationship between the employer, statutory or general, and the employee is in dispute, the court has jurisdiction to determine it.[10]

■■ In diversity cases such as the case at bar, where a defendant files a cross-claim for indemnity against a co-defendant pursuant to Rule 13(g), Fed. R.Civ.P., the court has jurisdiction to decide it. Ordinarily cross-claims are considered ancillary to the main claim and need not have the characteristics necessary to qualify for independent consideration by a federal court; however, we point out that diversity of citizenship does exist between Marquette and Dravo and the amount in controversy exceeds the jurisdictional amount. 3 Moore, Federal Practice, ¶ 13.36, pp. 97–98 (2d ed. 1964); City of Boston v. Boston Edison Company, 260 F.2d 872 (1st Cir. 1958).

We think Dravo's fifth reason is without merit.

Appropriate orders will be entered.

9. See: Brown v. Dickey, 397 Pa. 454, 155 A.2d 836 (1959); Maio v. Fahs, 339 Pa. 180, 14 A.2d 105 (1940); Stringert v. Lastik Products Co., 397 Pa. 503, 155 A.2d 625 (1959), an employee sued the general contractor and a subcontractor who brought in plaintiff's employer, also a subcontractor; Swartz v. Conradis, 298 Pa. 343, 148 A. 529 (1929), an employee sued the general contractor; McIntyre v. Strausser, 365 Pa. 507, 76 A.2d 220 (1950), an employee sued his employer and another jointly.

10. See: Winters v. Herdt, 400 Pa. 452, 162 A.2d 392 (1960); Swartz v. Conradis, supra; Socha v. Metz, 385 Pa. 632, 123 A.2d 837 (1956).